IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 21, 2022

**DUSTIN SHAWN PRICE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2681      Angelita Blackshear Dalton, Judge**

**No. M2021-00895-CCA-R3-PC**

In 2009, a Davidson County jury convicted the Petitioner, Dustin Shawn Price, of first degree felony murder, first degree premeditated murder, two counts of reckless endangerment, and three counts of attempted first degree murder. The trial court sentenced him to life plus forty years of incarceration. The Petitioner appealed his convictions to this court, and we affirmed the judgments. *State v. Dustin Shawn Price*, No. M2012-00117-CCA-R3-CD, 2013 WL 4539034, at *1 (Tenn. Crim. App., at Nashville, Aug. 26, 2013), *no perm. app. filed*. Subsequently, the Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel, which the post-conviction court denied after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and J. ROSS DYER, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Dustin Shawn Price.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Background**

This case arises out of two shootings that occurred in Hermitage on March 26 and March 29, 2008, as well as a third shooting that occurred on November 11, 2008. A Davidson County grand jury returned a sixteen-count indictment, and the Petitioner proceeded to trial on two counts of attempted murder for the March 26 shooting and first

degree felony murder, first degree premeditated murder, and three counts of attempted first degree murder for the March 29 shooting. *Id.* The counts of the indictment related to the November 11 shooting were severed, and the Petitioner entered guilty pleas to the remaining counts of the indictment. *Id.*

## A. Trial

The following is this court's summary on appeal of the facts presented at pretrial hearings and the Petitioner's trial:

> At the September 10, 2010 hearing on the motion to sever, retired Hermitage Police Department Homicide Detective Clinton Vogel testified that he first became involved in the case when he was called to respond to the March 29, 2008, 10:30 p.m. shooting on Linden Green. In that case, a pregnant woman, Heather Silas, was killed and her boyfriend, Aaron Dixon, was injured when individuals pulled up in front of the house in a gold-colored Nissan or Honda and sprayed the house with 9-millimeter bullets. Two other women, Megan Ryman and Kimberly Martin, were in the residence at the time of the shooting but were not injured. The house was "absolutely riddled" with bullets, and officers recovered twenty spent shell casings and seven projectiles from the scene.

> Detective Vogel testified that Dixon and one of the two female victims gave him the name of the [Petitioner] as a suspect, with both of them informing him that the [Petitioner] had accused Dixon of having committed a home invasion/armed robbery at the [Petitioner's] home three or four days earlier, in which he had duct-taped the [Petitioner's] sister and her friends. Dixon also told him that the [Petitioner] drove a gold Nissan Altima, and Detective Vogel subsequently learned that the defendant had access to a gold Nissan Altima that was registered to his seventeen-year-old sister, Amy Price. Detective Vogel stated that the [Petitioner] was stopped in that vehicle on March 30. Inside the vehicle, officers found a live 9-millimeter round, a baseball bat, a hammer, plant material that appeared to be marijuana, a white powder substance, a loaded pistol, a "large grotesque Halloween mask," blue rubber gloves, a blue whiskey bottle bag, and a second loaded firearm that was "secreted underneath a panel."

> Detective Vogel testified that he first learned about the March 26 shooting from a fellow detective to whom the case had been assigned. In that case, an individual wearing a "really ugly scary Halloween-type mask," similar to the one recovered from the [Petitioner's] vehicle, was seen walking with a TEC-9 machine pistol toward the rear of a house on South Graycroft and firing numerous shots at the house. A witness reported that a gold-colored automobile was parked near his house at the time of the shooting,

2

and the witness identified the [Petitioner] from a photographic lineup as one of the perpetrators. On the night of the Linden Green shooting, the house on Graycroft was set on fire.

Detective Vogel testified that during the course of his investigation, a man named Mario Brooks came forward to inform the detectives that Christopher Alexander had sold a TEC-9 pistol to one of Brooks's acquaintances, telling the purchaser that there were "two bodies on it," which was street terminology meaning that the weapon had been used in two murders. Brooks told the detectives that his acquaintance had been stopped by the police, who had recovered the gun. He also told the detectives that he had spoken to the [Petitioner] on the night of the March 29 shooting and that the [Petitioner] and Christopher Alexander had admitted their involvement in the shooting.

Detective Vogel testified that Brooks was "extremely afraid" of the [Petitioner] and "let [the detectives] know under no uncertain terms that he feared for his well-being, if not his life." He said that on November 11, 2008, a few weeks after Brooks's interview with the detectives, Brooks and a companion were shot and wounded while traveling in the early hours of the morning at the intersection of Central Pike and South New Hope. When he responded to the scene, Brooks told him that the [Petitioner] had pulled up beside him in another vehicle and "started popping caps."

Later that same day, officers arrested the [Petitioner] at the home of Velda Spain, who was the mother of Bobby Spain, a close friend of the [Petitioner's]. During that arrest, they recovered some long guns, a bulletproof vest, digital scales, and a .45-caliber semi-automatic pistol that was subsequently matched to spent .45-caliber shell casings recovered from the scene of the Central Pike/South New Hope shooting. Ballistics testing also matched the 9-millimeter shell casings from the Graycroft and Linden Green shootings and the live 9-millimeter round recovered from the [Petitioner's] car to the TEC-9 pistol that Brooks said had been sold to his acquaintance by Christopher Alexander.

Detective Vogel further testified that he had listened to five or six recorded telephone conversations between the [Petitioner] and Bobby Spain, which were made on March 26 and March 27, 2008, when Spain was in jail. He said in those conversations, the [Petitioner] and Spain discussed the Graycroft and Linden Green shootings and the [Petitioner] "was definitely looking for [Aaron] Dixon." On cross-examination, Detective Vogel testified that he was unaware of any connection between the March 26 Graycroft shooting and the March 29 Linden Green murder other than that

3

the same weapon was used in both shootings and that there was a social connection between some of the victims. On redirect examination, however, he recalled that during his recorded conversations with Spain, the [Petitioner] mentioned that he was looking for not only Aaron Dixon but also Patrick Fielder, who was one of the victims of the March 26 Graycroft shooting. According to Detective Vogel, the [Petitioner] expressed his belief that Fielder had been involved with Dixon in the robbery of his sister. Detective Vogel also recalled that Brooks told him that the [Petitioner] was searching for the TEC-9 weapon and believed that Brooks had it.

. . . .

Todd Tinnin, one of the victims of the Graycroft shooting, was at the residence early on the morning of March 26 with his girlfriend, his girlfriend's daughter, and Patrick Fielder when he heard footsteps on the gravel outside, opened the door, and encountered a man wearing a red mask. As he was confronting the masked man, Tinnin looked down the road and saw the [Petitioner] standing beside the open passenger door of a gold car. The next thing he knew, the [Petitioner] fired several gunshots, one of which struck a grill and narrowly missed hitting him. Tinnin did not report the shooting until the house was set on fire a few days later, when he mentioned it to a fire marshall. The fire marshall then brought in a police detective, who interviewed Tinnin and showed him a photographic lineup from which he identified the [Petitioner] as the shooter.

Investigator Michelle Ray of the Davidson County Sheriff's Department, who said she was "the point of contact for the inmate phone system," explained the automated computer system that recorded each Davidson County Jail inmate's telephone calls and how she was able to search for and retrieve recordings of telephone calls that had been placed to the [Petitioner's] cell phone, as well as those which had been made using the PIN number that had been assigned to inmate Bobby Spain. She said the calls to the [Petitioner's] cell phone had been placed using both Spain's PIN number and the PIN number of another inmate who had been housed with Spain in the Davidson County Jail at one time but who was no longer incarcerated at the facility when the phone calls were made. Investigator Ray identified the CDs of those telephone calls, which were admitted as exhibits at trial and played for the jury following Detective Vogel's testimony identifying the [Petitioner's] voice on the tapes. In the recordings, which are somewhat difficult to understand, the [Petitioner] related what happened during the Graycroft shooting, including his having fired at Tinnin outside on the deck and struck a grill beside him, and his intentions to locate and kill Dixon.

4

Two of Aaron Dixon's friends described how the [Petitioner] had been searching for Dixon in the days before the March 29 shooting and how Dixon had been acting nervous and scared of the [Petitioner].

The two women who were in the house with Dixon and Silas at the time of the March 29 shooting described the multiple gunshots that were sprayed into the living room and the front bedroom of the home and how they sought refuge by jumping into the bathtub. Megan Ryman testified that she heard one long series of gunshots, a pause as if the shooters were turning their vehicle around at the end of the dead-end street, and a second long series of gunshots. Kimberly Martin testified that she and the other three adults in the house were sitting in the living room when the gunshots started. She said she initially hit the floor and then ran toward the bathroom, while Silas ran straight toward what she assumed was her child's bedroom. Martin, like Ryman, described hearing an initial long series of gunshots, a pause as if a car were turning around, and then another series of gunshots.

One of the [Petitioner's] friends, Rachel Stanley, explained that the events that occurred in the case started when she was with the [Petitioner's] sister, Amy Price, and another friend at their Antioch home and three men she had never seen before, two of which were armed with guns and one with a baseball bat, entered, duct-taped them, ransacked the house looking for drugs, took their cash and some other small items, and threatened that they were going to kill the [Petitioner]. She said the [Petitioner] was very angry about the incident and ranted throughout the next week that he was going to "fuck somebody up." After the Graycroft shooting, she overheard the [Petitioner] say that he had laid in wait outside Patrick Fielder's home and fired gunshots at him from a position underneath the house. On the day after the Linden Green shooting, the [Petitioner] told her that he had "fucked up" and that "somebody died."

Mario Brooks was called to the stand and pled the Fifth Amendment when asked his age. He then answered "no" to a series of questions including whether he wanted to tell the prosecutor if he knew the [Petitioner], if he had given a recorded statement to police, and whether he wanted to talk about what was in his statement. After a jury-out hearing, the trial court ruled that the State could introduce parts of Brooks's videotaped statement to police under Tennessee Rule of Evidence 803(26) as a prior inconsistent statement. The State then resumed questioning Brooks, who at first testified that he did not remember giving a statement to police. When then asked about whether he had made specific statements during the interview, he replied at various times that he did not remember, that he did not think so, that the statement

5

was not true, that he had not said certain things, or that yes, he had made the statement.

During his testimony, Brooks acknowledged having said that the defendant told him that he had "shot up" the Graycroft and Linden Green houses and that the defendant had asked him to provide him with an alibi for the Linden Green murder. On cross-examination, he acknowledged having told the police that Christopher Alexander had sold the TEC-9 gun to his (Brooks's) brother for $150. On redirect and recross examinations, he testified that he did not tell the police the truth and made the statement at the request of his brother, who was in trouble with the law at the time.

The State later recalled Detective Vogel, who identified the CD of his interview with Mario Brooks. The State then played a brief portion of the tape, which, according to the prosecutor, contained only those statements that were inconsistent with Brooks's trial testimony. The tape was not admitted as an exhibit and is not in the record before this court.

The [Petitioner's] sister, Amy Price, testified on the [Petitioner's] behalf that the [Petitioner] was with her at a party during the time of the Linden Green murder. Detective Vogel, who was recalled as a rebuttal witness for the State, testified that Price told him in an interview after the murder that the [Petitioner] had called her at about the time of the Linden Green shooting and that, during the call, she had heard the sound of at least fifteen gunshots and the [Petitioner] yelling over the phone, "This is for you."

*Price*, at *1-6. Based on this evidence, the jury convicted the Petitioner of first degree felony murder, first degree premeditated murder, two counts of reckless endangerment, and three counts of attempted first degree murder. The trial court imposed a total effective sentence of life plus forty years in the Department of Correction. *Id.* at *1.

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief, *pro se*, which was later amended by appointed counsel, alleging that he had received the ineffective assistance of counsel on numerous bases; relevant to this appeal, he alleged that trial counsel ("Counsel") was ineffective in cross-examining the State's witnesses and in failing to present a defense by not calling alibi witnesses or expert witnesses.

The following evidence was presented at a hearing on the petition: The Petitioner testified that Counsel had been his "family attorney" since the Petitioner was a teenager and that he initially retained Counsel to represent him at trial until he ran out of money; Counsel represented him *pro bono* for the remainder of the case. The Petitioner stated that

6

Counsel visited him in jail prior to trial but that they did not prepare for trial during that time. The Petitioner recalled that he faced a multiple-count indictment with open file discovery. Because of the size of the case, the Petitioner wished that Counsel had filed a bill of particulars. The Petitioner stated that he had filed his post-conviction petition seven years prior to the hearing but stated that he was not ready to present the evidence at the post-conviction hearing.

The Petitioner testified that there was a lot of evidence presented at trial that was not in the discovery file, including Christopher Alexander's and Rachel Stanley's statements. The Petitioner agreed that Counsel filed a notice of alibi but then failed to subpoena the alibi witness whom the Petitioner identified as Ashley Tuggle. He stated that, at the time of the March 29 shooting, he was with Ms. Tuggle at a gas station. The Petitioner stated that Counsel never contacted or subpoenaed Ms. Tuggle, but he agreed that he did not give her contact information to Counsel prior to trial. The Petitioner also testified that Counsel never sought to obtain evidence of his using a credit card at that gas station at the time of shooting, which would have been useful evidence in proving his alibi. Further, Counsel never sought video footage from the gas station's security cameras, which might have placed the Petitioner there.

The Petitioner recalled that the State offered him a thirty-year sentence in exchange for a guilty plea for the March shootings and that he should have agreed to the offer. The Petitioner stated that Counsel should have, but did not, hire a ballistics expert. Counsel did employ an investigator to work on the case, and the investigator interviewed multiple witnesses. The Petitioner also wanted a voice expert to testify that the Petitioner's jailhouse phone calls that were played for the jury and contained inculpatory statements were not actually of the Petitioner's voice. The Petitioner stated that Counsel simply was not prepared for trial. He also stated that Counsel talked him out of testifying and giving his version of the events.

As to the alibi witnesses the Petitioner wanted to introduce at trial, he agreed that his post-conviction petition had been pending for seven years but stated that he needed more time to contact the witnesses. He stated that his defense was that he was in the area of the shooting, which alibi witnesses could attest to, but that he did not participate in the shooting. The Petitioner identified Leray Bender, Rico Bender, and Ashley Tuggle as potential favorable witnesses.

On cross-examination, the Petitioner stated that there were multiple recorded statements from witnesses that the defense did not obtain prior to trial. The Petitioner conceded that Counsel introduced the fact that the Petitioner's hands tested negative for gunpowder residue the day after the shooting but said Counsel did not "press the issue" that the Petitioner was not the shooter. The Petitioner explained that he dropped the shooter, Christopher Alexander, off and went to the gas station. He stated that Mr. Alexander admitted to the March shootings and later pleaded guilty, and that he would

7

have testified in the Petitioner's defense if Counsel had sought him out to testify.

Counsel testified that he had represented the Petitioner in juvenile court proceedings and was retained in this case. Counsel recalled that the State initially offered a twenty-year plea deal to second degree murder for the victim's March death. Counsel recalled that he was representing the Petitioner in several cases at the time related to these events and that the Petitioner was exonerated in the other cases. Counsel stated that it was the Petitioner's thinking that, based on his standing in the community, witnesses would not show up to his trial to testify against him in this homicide, and so, the Petitioner elected to go to trial. When the witnesses arrived in court, the Petitioner changed his mind but the State raised the plea offer to thirty years. The Petitioner declined the second offer. Counsel recalled discussing the evidence against the Petitioner with him. He stated that the victim was a ten-weeks-pregnant female who was inside the house when the shooting occurred. The Petitioner was a savvy and intelligent individual, and Counsel stated that the Petitioner was aware of everything happening.

Counsel testified that he had reread his case notes and stated that the Petitioner had given him names of three alibi witnesses – Rachel Stone, Rico Bender, and Leray Bender. Counsel retained a private investigator who interviewed, or attempted to interview, all three people as well as the Petitioner's sister. None of the four could provide an alibi, and Counsel felt that none of them except the Petitioner's sister would give favorable testimony. Counsel was cautious with the alibi witnesses because, on the notice of alibi, he was required to provide the witnesses' contact information, which would allow the prosecution an opportunity to investigate their backgrounds. Counsel did call the sister to testify because he felt she was a good witness.

Counsel testified that he met with the Petitioner six months prior to trial and had an agenda for how he planned to prepare for trial, which included getting the preliminary hearing transcript, filing pre-trial motions, obtaining all recorded statements and reports, filing a notice of alibi, and subpoenaing witnesses. In regard to obtaining a ballistics expert, Counsel testified that he cross-examined the State's "gun guy" on the inconsistencies of ballistic science. Counsel recalled filing a motion to exclude the ballistics evidence. He recalled consulting with a former ballistics analyst but decided not to call him as a witness. As for the aforementioned "voice expert," Counsel stated that there was no reason to obtain one because it was the Petitioner's voice on the calls, which he stated was a distinctive voice.

Counsel stated that he wished the Petitioner would get a new trial because Counsel had failed him by not insisting he take the State's plea deal. Counsel noted that he had filed a bill of particulars.

On cross-examination, Counsel testified that he did not remember the issue of the Petitioner's credit card being used at the gas station, records of which he stated would have

8

been easily obtained. Counsel testified that he received a report from the investigator and would have pursued every available avenue of defense from that report. He agreed that no experts were hired by the defense, but that he relied on cross-examination of the State's experts. Counsel testified that he cross-examined the State's cell phone expert about his qualifications which Counsel believed were inadequate. Counsel studied the subject of telephonic communications prior to trial and felt that his cross-examination of the State's cell phone expert was sufficient.

As for the Petitioner's proposed alibi witnesses, Counsel felt that they could not establish a solid alibi and that calling them as witnesses was risky based on their impeachment exposure. He stated that the theory of defense was that no positive identification of the Petitioner had been made and that all the evidence was circumstantial, which was also one of the reasons the Petitioner received a favorable plea offer from the State. Counsel recalled that when the Petitioner saw the witnesses against him being sworn, Counsel asked for a recess to allow the Petitioner to settle with the State, but they could not come to an agreement. He stated that the Petitioner was "sophisticated" in his understanding of criminal matters and was also very connected to the community.

On redirect-examination, Counsel clarified that he did call the Petitioner's sister as an alibi witness who testified that the Petitioner was with her at a party when the shooting occurred.

The post-conviction court issued an order denying the Petitioner relief and stating the following:

In the present case, the Petitioner first alleges that [Counsel] was ineffective by failing to adequately communicate and review evidence with him and help him understand the nature of the charges. To show that [Counsel] was ineffective on this issue, the Petitioner would have to show that [Counsel] was deficient in his performance by failing to adequately communicate with him. On this issue, the Court credits [Counsel's] post-conviction testimony that he met with [the Petitioner] in preparation for trial. [Counsel] maintained records to confirm his meetings with [the Petitioner] and action items taken in preparation for trial. During their conversations, [Counsel] discussed with [the Petitioner] the State's offer of twenty years, the nature of the charges and punishment. During his post-conviction testimony, [the Petitioner] failed to provide testimony contrary [to Counsel's] testimony of their meetings prior to the trial. [The Petitioner] admitted that [Counsel] visited with [the Petitioner] while he was incarcerated. However, [the Petitioner] failed to provide context of his meetings with [Counsel] that would show that [Counsel] inadequately communicated with [the Petitioner].

9

It is well established that the Petitioner's trial attorney had a duty to reasonably investigate and communicate with the Petitioner regarding his case. This Court does not believe that [Counsel] neglected that duty. Considering [Counsel's] testimony regarding his meetings with [the Petitioner], and the documentation within his files to confirm the meetings, this Court does not believe that clear and convincing evidence exists that [Counsel] performed deficiently in his representation of the Petitioner on this issue.

[The Petitioner] next alleges that [Counsel] was deficient in his representation by failing to call material witnesses to establish an alibi defense. In his written amended petition for post-conviction relief, [the Petitioner] asserts that [Counsel] failed to interview and call to testify at trial Rico Bender who could have established that [the Petitioner] was not at the scene of the shooting. At the post-conviction hearing, [the Petitioner] included Ashley Tuggle and LeRay Bender in his assertion that [Counsel] failed to interview and call alibi witnesses. At the post-conviction hearing, [Counsel] testified that in a meeting with [the Petitioner] on April 5, 2010, [the Petitioner] gave him the names of Rachel Stone, Rico Bender, and LeRay Bender. [The Petitioner] admitted that he did not give Ashley Tuggle's name as an alibi witness to [Counsel]. [Counsel] testified that his file notes indicate that he spoke with Ms. Stone and Rico Bender. He believed that his investigator spoke with LeRay Bender. After talking with Ms. Stone and Rico Bender, [Counsel] determined that it was in [the Petitioner's] best interest to not call them to testify because they would not have been able to establish an alibi for [the Petitioner]. According to the notes in [Counsel's] file, the witnesses were at a party in Mt. Juliet, Tennessee prior to the shooting, and would not have been able to establish the whereabouts of [the Petitioner]. Based on the inability of the witnesses to establish an alibi for [the Petitioner], [Counsel] explained to him that it was in his best interest to not call them to testify at trial.

. . . .

[Counsel] maintains that his decision to not call Ms. Stone, Rico Bender, and LeRay Bender to testify at trial was because after his investigation of their proposed testimony, they would not have been able to establish an alibi defense for [the Petitioner]. By concluding that it was not in [the Petitioner's] best interest to call the proposed witnesses to testify at trial based on their inability to establish an alibi, this Court does not believe that he performed deficiently in his representation of the Petitioner on this issue. It should be noted that [Counsel] did call [the Petitioner's] sister as an alibi witness.

Even if the Court found that [Counsel's] performance was deficient on this issue, the Petitioner would have to show that he was prejudiced by [Counsel's] failure to call witnesses to establish an alibi. To prevail on this issue, the Petitioner would have to show that the outcome of the trial would have been different had the witnesses been called to testify. As noted, [Counsel] called [the Petitioner's] sister as an alibi witness. As it relates to the testimony of Rachel Stone, and Rico and LeRay Bender, [the Petitioner] failed to produce them at the post-conviction hearing to show that they could have established an alibi for [the Petitioner], thereby showing that the outcome of the trial would have been different. As such, the Petitioner has failed to show that his trial attorney was ineffective on this issue.

The Petitioner next alleges that his trial attorney was ineffective by not providing discovery and failing to employ a voice analyst and ballistics expert. Although not alleged in the amended petition, [the Petitioner] argued at the hearing that his trial attorney was ineffective by not seeking his credit card records to show that he had purchased lemonade and cigarettes at the Marathon gas station at the time of the shooting. [The Petitioner] contends that a voice analyst could have established that the voice on the recorded jail calls was not that of [the Petitioner]. Additionally, [the Petitioner] asserts that that a ballistics expert would have shown that "the bullet did not come from the gun." On the issue of providing discovery to [the Petitioner], the Court credits [Counsel's] testimony that he went over the evidence with [the Petitioner]. Additionally, contrary to [the Petitioner's] contention that [Counsel] failed to file a motion for bill of particulars, [Counsel] testified, and it is confirmed in the Court's record, that [Counsel] filed a motion for bill of particulars seeking the identity of victims alleged in the indictment. The Court notes that during his postconviction testimony, [Counsel] referenced detailed notes maintained in his file in preparation of the trial in this case. With regards to [Counsel's] failure to employ a voice analyst, the Court credits [Counsel's] testimony that after listening to the recorded jail calls, he had no reason to believe that the voice on the recordings was not that of [the Petitioner]. Regarding [Counsel's] failure to employ a ballistics expert, the Court credit [Counsel's] testimony that he utilized the 2009 National Academy of Science Report to cross examine the State's ballistics witness on the reliability of tool mark and pattern evidence. As to [the Petitioner' contention that [Counsel] failed to seek credit card records, the Court credits [Counsel's] testimony that he did not recall having a discussion with [the Petitioner] about his purchases at the Marathon gas station.

As noted supra with regards to the strategy decisions of trial counsel, this Court finds that [Counsel] made informed decisions on the issues alleged

11

by the Petitioner based on the information that [Counsel] had at the time. As such, this Court finds that the Petitioner has failed to show that his trial attorney performed below an objective standard of reasonableness. Furthermore, the Court notes that [the Petitioner] has failed to provide evidence through the testimony of a voice analyst or ballistics expert, or credit card records for this Court's consideration to show that such evidence would have changed the outcome of the trial.

It is apparent that [the Petitioner] exercised his constitutional right to plead not guilty as evidenced by the case proceeding to a jury trial. [Counsel] acknowledged that as counsel, it is his job to advise his client; as counsel, the trial attorney cannot make the decision for the client. [The Petitioner] has failed to show that [Counsel] "tried to force him to plead guilty." To the contrary, upon [the Petitioner's] decision to not accept the State's offer, as evidenced by the action items noted in his file, [Counsel] took reasonable measures to prepare for trial. Therefore, the Court finds that the Petitioner has failed to show that his trial attorney was deficient on this issue.

Having found that Petitioner has failed to meet the burden for his claim of ineffective assistance of counsel pursuant to Strickland, this Court finds the Petitioner's claims are without merit.

(footnotes omitted).

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel. He contends that Counsel did not present a defense against the State's evidence by failing to call any witnesses in the Petitioner's defense, including certain expert witnesses such as a telecommunications expert or a voice analyst. He contends that Counsel did "minimal" work in his representation of the Petitioner. The State responds that the record makes clear that Counsel effectively represented the Petitioner and made reasonable and strategic decisions in his pretrial preparation and during investigation and trial. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). The post-conviction court's findings of fact are conclusive

on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462.

Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). A petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland*. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990).

The Petitioner contends that Counsel was ineffective for failing to present an adequate defense, specifically by not presenting expert witnesses or alibi witnesses. The post-conviction court found that Counsel had conducted an adequate investigation into the witnesses' alleged ability to provide an alibi for the Petitioner and made a reasonable decision not to call them as witnesses based on their impeachment risk or unfavorable testimony. As for the Petitioner's claim that Counsel should have called certain experts to testify, the post-conviction court found that Counsel made a strategic decision to cross-examine the State's experts rather than present additional experts. Furthermore, the post-conviction court found that Counsel was prudent when he concluded that calling additional expert witnesses would not help the Petitioner's case, particularly the voice analyst because the Petitioner's voice clearly was on the jailhouse recordings.

The evidence does not preponderate against the post-conviction court's findings. Counsel testified that he was well prepared for trial and had met with the Petitioner numerous times. Many decisions that Counsel made were done just before or during trial after the Petitioner elected to reject the State's plea offer. Such strategic or tactical decisions are given deference on appeal if the choices are informed and based upon

adequate preparation. *See Goad*, 938 S.W.2d at 369; *see also Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Counsel testified that he saw no reason to call additional expert witnesses, because, in his estimation of their potential testimony, they would not have aided the Petitioner's defense. Counsel, however, testified that he was effective on cross-examination of the State's experts and made some headway during their testimony. As for the alibi witnesses, Counsel testified that he and his hired investigator met with and interviewed the witnesses when possible and that Counsel judged their testimony to be unfavorable or unhelpful to the Petitioner's case. Again, we will not second guess this decision as the evidence shows it was based on adequate preparation. *Id.* Additionally, the Petitioner did not present any of the proposed witnesses at the post-conviction hearing. As we have noted, the Petitioner is responsible for presenting at the post-conviction hearing the witnesses whose testimony he claims would have changed the outcome of his trial. *Black*, 794 S.W.2d at 757-58. His failure to do so dictates that he falls short of proving the required standard of prejudice. *Id.* The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE